IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUAVIS K. WILLIAMS, | ) | CASE NO. 4:14CV1653 |
| | ) | |
| Petitioner, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| A. LAZAROFF, | ) | |
| | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

Petitioner Jacquavis Williams ("Petitioner" or "Williams") brings this habeas corpus

action pursuant to 28 U.S.C. § 2254.  Doc. 1.  Williams is detained at the Mansfield Correctional

Institution, having been found guilty by a Trumbull County, Ohio, Court of Common Pleas jury

of one count of felonious assault and one count of aggravated robbery, each with a firearm

specification.  Doc. 10-1, pp. 37-40.[1]  *State v. Williams*, Case No. 11-CR-555 (Trumbull Cty.

Common Pleas Ct. filed March 15, 2012).  The trial court sentenced Williams to seven years

each on the felonious assault and aggravated robbery counts and three years on each firearm

specification, to be served consecutively, for an aggregate term of twenty years in prison.  Doc.

10-1, p. 57.

On July 28, 2014, Williams filed his Petition for Writ of Habeas Corpus setting forth

three grounds for relief.  Doc. 1, pp. 6-15.  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.  As set forth

more fully below, Grounds One and Two are not cognizable and Ground Three fails on the

---

[1]  Doc. page citations are to ECF Doc. page numbers.

merits.  Thus, the undersigned recommends that Williams' Petition for Writ of Habeas Corpus

(Doc. 1) be **DISMISSED** in part and **DENIED** in part.[2]

## I.  Background

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, the state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).

The petitioner has the burden of rebutting that presumption by clear and convincing evidence.

28 U.S.C. § 2254(e)(1); *see also Railey v. Webb*, 540 F. 3d 393, 397 (6th Cir. 2008).

### A.  State Court Action

#### 1.  Underlying facts

The following summary of underlying facts is taken from the opinion of the Trumbull

County Court of Appeals, Eleventh Appellate District of Ohio:[3]

> {¶ 1} Appellant, Jacquavis Kentrell Williams, appeals the judgment of conviction
> entered by the Trumbull County Court of Common Pleas for felonious assault and
> aggravated robbery. The issues to be determined by this court are whether a motion to
> suppress statements was properly denied; whether convictions for the foregoing charges
> are supported by the manifest weight of the evidence; and whether felonious assault and
> aggravated robbery are allied offenses that should merge for sentencing. For the
> following reasons, we affirm the judgment of the lower court.
>
> {¶ 2} On October 18, 2011, the Trumbull County Grand Jury indicted Williams on one
> count of felonious assault, a felony of the second degree, in violation of R.C.
> 2903.11(A)(2) and (D)(1)(a), with a firearm specification pursuant to R.C. 2941.145; and
> one count of aggravated robbery, a felony of the first degree, in violation of R.C.
> 2911.01(A)(1) and (C), with a firearm specification pursuant to R.C. 2941.145.
>
> {¶ 3} On December 2, 2011, Williams filed a motion to suppress statements, asserting
> that statements he made at the Warren Police Department, including private
> conversations, were improperly recorded by a hidden surveillance device. A suppression
> hearing was held on February 17, 2012, where the following facts were adduced through
> testimony.

---

[2]  The grounds in the petition that are not cognizable result in dismissal; the ground in the petition that is addressed on the merits results in a denial.

[3]  Williams has not demonstrated by clear and convincing evidence that the state court's findings were incorrect. Accordingly, the state court's findings are presumed correct. *See* 28 U.S.C. § 2254(e)(1); *see also Railey*, 540 F. 3d at 397.

{¶ 4} Detective Wayne Mackey, of the Warren Police Department, indicated he was the lead investigator assigned to a shooting and robbery that occurred on April 12, 2011, at the North End Market in Warren, Ohio. During the investigation, a DNA sample was taken from a drink bottle the victim said had been brought to the counter by the shooter during the robbery. The initial investigation, however, yielded no suspects.

{¶ 5} Four months after the robbery, the Warren police received a report from the Ohio Bureau of Criminal Identification and Investigation ("BCI") on August 15, 2011, regarding a "hit," i.e. a match, with DNA from the Combined DNA Index System ("CODIS"), a database that includes DNA records of convicted felons. The BCI report indicated that DNA from a major and a minor contributor had been recovered from the drink bottle found at the scene. The victim was identified as the major contributor. The minor contributor was most probably Williams, whom the report concluded could not be excluded as the source of the sample by a ratio of one in 5,807 unrelated persons.

{¶ 6} On August 17, 2011, a warrant was issued for Williams' arrest. Later that evening, Williams turned himself in at the Warren Police Department. Detective Mackey testified that at this point, Williams was in custody and was not free to leave.

{¶ 7} Detective Mackey met with Williams and his mother in a secure waiting area at the station to conduct an interview. Williams did not request a lawyer but wanted his mother present during the interview. Detective Mackey then escorted Williams and his mother to an interview room in a secure and non-public area of the police station.

{¶ 8} The interview room contained a desk and a couple of chairs. There were no windows or mirrors. Essentially, there was nothing in the room that would lead any person to believe there was any way to view into the room, or anything that would have been recognized as a recording or monitoring device. There was no sign indicating that recording might be taking place. Detective Mackey testified there was a video and audio recording device hidden in the thermostat and that the rooms are monitored for safety purposes. He further testified that Williams was familiar with the interview room, as he had previously been interviewed therein by other detectives regarding another matter. No evidence in the record indicates that Williams' familiarity with the room included knowledge of the hidden recording device.

{¶ 9} Detective Mackey left Williams and his mother alone in the room with the door closed while he went to retrieve a *Miranda* waiver form and case file. Detective Mackey turned on the recording device just after leaving the room, which recorded a conversation between Williams and his mother. Detective Mackey testified that Williams and his mother did not indicate they wanted to talk alone, request privacy, or ask not to be recorded.

{¶ 10} While alone with his mother, Williams admitted to being at the North End Market on the day of the incident. He assured her he was innocent and claimed he had frequented the store even after the shooting. Williams insisted he was being "railroaded."

{¶ 11} The recording then shows Detective Mackey, after he re-entered the room, reading Williams his constitutional rights. Detective Mackey testified that Williams indicated he understood the rights and initialed each line on the form. Williams did not request an attorney and agreed to give the detective a statement. Williams stated he did not know or remember if he had been in the store on the exact date the victim was shot and robbed. Williams told Detective Mackey that he was a regular customer at the store, where he usually purchased the same chips, drink, and a Black and Mild cigar. Williams denied shooting the victim.

{¶ 12} Following the suppression hearing, both sides submitted briefs in support of their positions. On March 12, 2012, the trial court issued a judgment entry denying Williams' motion to suppress. The court held there was no reasonable expectation of privacy regarding the conversations held in the interview room.

{¶ 13} A jury trial commenced on March 12, 2012. The following testimony and evidence were presented.

{¶ 14} Mohammad Darwish testified that he and his wife, Itaf Darwish, own the North End Market, a neighborhood store, and know most of their customers. Darwish testified that a six-foot tall, 180–pound African–American man with a tattoo on his neck, whom he did not know, walked through the front door of his store on April 12, 2011, at approximately 11:30 a.m. The man passed by Nicholas Phelps, a long-time customer, as Phelps was exiting the store.

{¶ 15} According to Darwish, the man brought a bag of chips and a bottle of blue Guzzler drink to the counter and asked for a Black and Mild cigar. Darwish turned around to get the cigar and placed it on the counter. Without warning, the man shot Darwish and then ordered Darwish to give him money. Darwish gave him cash from the lottery ticket register. The man demanded more. Darwish tried to access a second cash drawer but, due to his injuries, was unable to do so. Instead, Darwish retrieved more cash from the store office.

{¶ 16} The assailant then headed out of the store and into the parking lot. Darwish saw his wife drive up, went to the door, and warned her to leave. In the meantime, the assailant left heading toward Arlington Street.

{¶ 17} Itaf testified that when she arrived at the store, her husband was screaming at her to leave, and she saw a man running away from the store. She followed the perpetrator in her car but lost him.

{¶ 18} Darwish was hospitalized for approximately one week. The bullet shattered his hand and tore through his stomach. He initially told Detective Mackey that he could identify the shooter if given the opportunity to see him again, but the police came up with few leads and had no suspect for several months.

{¶ 19} Lindsey Nelsen–Rausch, a forensic scientist at BCI, testified that, during the course of the investigation, she took a touch DNA sample from the drink bottle submitted

to BCI by the Warren Police Department. Pursuant to Detective Mackey's testimony, this DNA was ultimately matched with DNA in the CODIS system, which belonged to Williams.

{¶ 20} Brenda Gerardi of BCI testified that the DNA profile found on the bottle was a "mixture," including both "major" and "minor" contributors. The major contributor to the DNA sample was Darwish. The minor DNA contributor matched Williams, insomuch as Williams could not be excluded as a source of the sample by a ratio of one in 5,807 unrelated individuals. Based on the DNA evidence, a warrant was issued for Williams' arrest.

{¶ 21} Dawn Limpert of BCI testified that she compared partial fingerprints found on the drink bottle with fingerprints from Williams and found that he was not the source of the prints. She did not match any individuals to the fingerprints on the drink bottle.

{¶ 22} Approximately four months after the incident, Detective Mackey presented Darwish and Phelps with photo arrays that included a picture of Williams. Both men were unable to identify Williams.

{¶ 23} The video recording of the interview made after Williams surrendered to the police was played at the suppression hearing and for the jury. This included his statement to his mother that he was at the store on the date of the incident but was innocent. When Detective Mackey returned, however, Williams stated he could not remember when he had been in the store. As was testified to at the suppression hearing, Williams stated that, on the occasions when he did go to the store, he always purchased chips, a drink, and a Black and Mild cigar.

{¶ 24} Following the trial, the jury found Williams guilty on both counts, including the firearm specifications.

{¶ 25} A sentencing hearing was held on May 16, 2012. At the hearing, Williams' counsel argued that aggravated robbery and felonious assault should be merged. The court found there was a separate animus for the shooting and the robbery and, thus, were two separate crimes for the purpose of sentencing. The trial court concluded that the victim did not need to be shot to carry out the robbery, and there was "a malice separate from theft with a deadly weapon" involved in the shooting incident.

{¶ 26} The trial court sentenced Williams to a term of seven years in prison for felonious assault, seven years for aggravated robbery, and three years each for the firearm specifications, all to be served consecutively, for a total prison term of 20 years.

Doc. 10-1, pp. 136-142; *State v.Williams*, 2013 WL6081535, at *1-4 (Oh. Ct. App. November 18, 2014).

### 2. Procedural history

On October 18, 2011, a Trumbull County Grand Jury indicted Williams on one count of Felonious Assault, Ohio Revised Code §2903.11(A)(2)&(D)(1)(a), with a firearm specification and one count of Aggravated Robbery, R.C. §2911.01(A)(1)&(C), with a firearm specification. Doc. 10-1, pp. 4-5.  Williams pleaded not guilty to the charges.  Doc. 10-2, p. 7.

On December 2, 2011, Williams, through counsel, filed a motion to suppress statements he made during the conversation he had with his mother in the interview room.  Doc. 10-1, pp. 9-11.  On March 12, 2012, the trial court overruled his motion.  Doc. 10-1, pp. 32-36.   The case proceeded to trial.  The jury found Williams guilty on all charges and specifications in the indictment.  Doc. 10-1, pp. 37-40.  On May 25, 2012, the trial court sentenced Williams to seven years in prison for felonious assault, seven years for aggravated robbery, and three years each for the firearm specifications, to be served consecutively, for a total prison term of twenty years. Doc. 10-1, p. 57.

**B. Direct Appeal**

Williams, through new counsel, appealed to the Eleventh District Court of Appeals, Trumbull County.  Doc. 10-1, p. 63-80.  He raised the following assignments of error:

> 1. The trial court erred, as a matter of law, by denying the Appellant's motion to suppress statements made by the Appellant during a conversation with his mother which occurred in a room at the Warren Police Department.
>
> 2. The Appellant's convictions are against the manifest weight of the evidence.
>
> 3. The trial court erred, as a matter of law, by sentencing the Appellant for both the crimes of aggravated robbery and felonious assault, along with the related gun specifications.

Doc. 10-1, pp. 64-65.  On November 18, 2013, the Ohio Court of Appeals affirmed the trial court's judgment.  Doc. 10-1, p. 136; *Williams*, 2013 WL6081535, at *10.

**C. Ohio Supreme Court**

6

On December 30, 2013, Williams, through counsel, filed an appeal to the Ohio Supreme

Court.  Doc. 10-1, p. 169.  In his memorandum in support of jurisdiction, Williams presented the

following propositions of law:

> 1. A criminal suspect may have a reasonable expectation of privacy in a police
> interrogation room depending upon the facts and circumstances of the case.
>
> 2. Aggravated robbery and felonious assault are allied offenses of similar import,
> committed with the same animus, where the facts reveal that the felonious assault is
> committed in furtherance of the aggravated robbery.

Doc. 10-1, p. 173.  On March 26, 2014, the Ohio Supreme Court declined to accept jurisdiction

of the appeal.  Doc. 10-1, p. 238.

### D. Federal Habeas Petition

On July 28, 2014, Williams, *pro se*, filed his Petition for a Writ of Habeas Corpus.  Doc.

1.   He listed the following grounds for relief:

> **Ground One**: State Court Denied Petitioner Williams['] "Motion to Suppress["]
> Statements made by the Appellant during a conversation with his mother which occurred
> in a PRIVACY room at the Warren Police Department.
>
> **Ground Two**: The Petitioner Convictions are against the Manifest Weight of the
> Evidence.
>
> **Ground Three**: State Court Sentenced the Petitioner Williams for both the Crimes of
> Aggravated Robbery and Felonious Assault, along with the related Gun Specifications,
> for a violation of the "ALLIED OFFENSES".

Doc. 1, pp. 6-15.  On November 4, 2014, Respondent filed a Return of Writ (Doc. 10) and

Williams filed a Traverse (Doc. 15).  Respondent argues that Grounds One and Three fail on the

merits and that Ground Two is not cognizable and is procedurally defaulted.  Doc. 10, pp. 10-18.

## II. Law

### A.  Standard of Review under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No.

104-132, 110 Stat. 1214 ("AEDPA"), apply to Williams' habeas petition because he filed it after

the effective date of AEDPA.  28 U.S.C. § 2254; *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  In order to obtain habeas relief under 28 U.S.C. § 2254(d), a petitioner must show either that the state court decision (1) resulted in a decision contrary to, or involving an unreasonable application of, clearly established federal law as determined by the United States Supreme Court ("contrary to" clause); or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings ("unreasonable application" clause).  *Id*.

"Under the 'contrary to' clause, a federal habeas court may grant a writ if the state court arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id. at 413*.  "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, as well as legal principals and standards flowing from Supreme Court precedent.  *Id*. at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent.  *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005).  If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law.  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

In determining whether the state court's decision involved an unreasonable application of law, the court employs an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

### III. Claim Analysis

Williams sets forth three grounds for relief in his Petition. Doc. 1, pp. 6-15. Respondent argues that Ground One and Three fail on the merits and Ground Two is not cognizable and procedurally defaulted. For the reasons that follow, the undersigned concludes that Grounds One and Two are not cognizable and Ground Three fails on the merits.

#### A.  Ground One is not cognizable

In Ground One, Williams argues that his Fourth Amendment rights were violated when his conversation with his mother was recorded at the police station and that the state trial court erred when it denied his motion to suppress. Doc. 1, p. 6. The Ohio Court of Appeals considered Williams' claim:

> {¶ 28} In his first assignment of error, Williams argues the trial court erred by failing to suppress the conversation he had alone with his mother in the police station interview room. Williams asserts that he was entitled to an expectation of privacy and that the surreptitious recording of the conversation between Williams and his mother violated Williams' rights under the Fourth Amendment to the United States Constitution.
>
> {¶ 29} "The trial court acts as trier of fact at a suppression hearing and must weigh the evidence and judge the credibility of the witnesses." (Citation omitted.) *State v. Ferry*, 11th Dist. Lake No.2007–L–217, 2008–Ohio–2616, ¶ 11. "[T]he trial court is best able to

9

decide facts and evaluate the credibility of witnesses." (Citation omitted.) *State v. Wagner*, 11th Dist. Portage No.2010–P–0014, 2011–Ohio–772, ¶ 12. "The court of appeals is bound to accept factual determinations of the trial court made during the suppression hearing so long as they are supported by competent and credible evidence." *State v. Hines*, 11th Dist. Lake No.2004–L–066, 2005–Ohio–4208, ¶ 14. "Once the appellate court accepts the trial court's factual determinations, the appellate court conducts a de novo review of the trial court's application of the law to these facts." (Citations omitted.) *Ferry* at ¶ 11.

{¶ 30} Under general Fourth Amendment principles, a communication cannot be intercepted if there is an actual and justifiable expectation of privacy from the government. *State v. Buzzard*, 112 Ohio St.3d 451, 860 N.E.2d 1006, 2007–Ohio–373, ¶ 13. The Fourth Amendment protects an individual's subjective expectation of privacy when the expectation is reasonable. *Id.* at ¶ 14, 860 N.E.2d 1006, citing *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A fact-intensive, totality-of-the-circumstances inquiry is required in order to determine whether a specific place qualifies as "a place where there is a reasonable expectation of privacy." *Savoy v. United States*, 604 F.3d 929, 937 (6th Cir.2010).

{¶ 31} An intensive inquiry into the facts is necessary to determine whether a reasonable expectation of privacy exists in a certain place under certain circumstances. Given a certain set of facts, a legitimate expectation of privacy may exist though a person is under arrest and in an interrogation room. We do not believe that one can never have a reasonable expectation of privacy in a police interrogation room.

{¶ 32} The majority of cases conclude there is no reasonable expectation of privacy in conversations that occur in police stations, including interrogation rooms. *See, e.g., State v. Strohl*, 255 Neb. 918, 587 N.W.2d 675, 682 (Neb.1999) ("[t]he greater weight of authority * * * has consistently * * * upheld the admission of monitored conversations in police stations"); *Belmer v. Commonwealth*, 36 Va.App. 448, 553 S.E.2d 123, 128 (Va.App.2001) ("[g]enerally, the federal courts continue to find a suspect has no reasonable expectation of privacy in areas controlled by the police"). However, these cases continue to make a fact-intensive inquiry into whether a reasonable expectation of privacy existed. There are important factual distinctions between these cases and the case at issue.

{¶ 33} Other courts have found a reasonable expectation of privacy in a police interrogation room under facts similar to those presented here. *See, e.g., State v. Calhoun*, 479 So.2d 241, 244–245 (Fla.App.1985) (where there was a hidden camera and a *Mirandized* defendant was left alone to converse with his brother in an interrogation room pursuant to the defendant's request to speak privately with his brother, the conversation was not admissible); *State v. Howard*, 728 A.2d 1178, 1184 (Del.1998) (because there was no evidence that the defendant was told of the possibility of monitoring or that the defendant could see the camera, the defendant's expectation of privacy was reasonable).

10

{¶ 34} The state of Ohio argues that no reasonable expectation of privacy existed when appellant was left alone with his mother in the interview room; it relies mainly on two cases, both of which are distinguishable. First, the Seventh District has held that a defendant in custody did not have a reasonable expectation of privacy in a police interrogation room containing a two-way mirror. *State v. Clemons*, 7th Dist. Belmont No. 10 BE 7, 2011–Ohio–1177, ¶ 74–76. The *Clemons* court placed great weight on the presence of the two-way mirror in distinguishing it from other cases where it was determined that a reasonable expectation of privacy did exist. Furthermore, the *Clemons* court noted that the defendant had whispered the incriminating statements, indicating he was aware someone might be listening. *Id*. at 70. In this case, there was no two-way mirror or anything else to indicate the possibility of monitoring. Further, neither appellant nor his mother whispered during the conversation.

{¶ 35} Second, in *Belmer v. Commonwealth*, 36 Va.App. 448, 553 S.E.2d 123 (Va.App.2001), the Virginia Court of Appeals addressed the surreptitious monitoring of a conversation between the defendant and his mother that occurred in the police station's interview room. The *Belmer* court emphasized that (1) the detective never stated the defendant could speak freely; (2) the defendant knew he was the subject of an armed robbery investigation; and (3) the defendant "had no reason to believe this interrogation room was a 'sanctuary for private discussions.'" *Id*. at 129. The *Belmer* court held that, under the circumstances, no reasonable expectation of privacy existed: the room contained a two-way mirror, the conversation was whispered, and signs were posted that indicated the interview rooms were being monitored. *Id*. at 125. The defendant did not see the signs, but his mother and her boyfriend walked past them. *Id*. In the present case, there was no two-way mirror, no signs posted, and no whispering by appellant or his mother. Thus, in *Belmer*, there are facts to support the holding that the defendant had no reasonable expectation of privacy—facts that are not present here.

{¶ 36} The state of Ohio further takes the position that this case is similar to those related to the recording of conversations in police cars, where it is well-established that a detainee has no reasonable expectation of privacy under the Fourth Amendment. *See State v. Ingram*, 9th Dist. Medina No. 10CA0022–M, 2010–Ohio–3546, ¶ 17; *State v. Blackwell*, 8th Dist. Cuyahoga No. 87278, 2006–Ohio–4890, ¶ 33–35; *State v. Skidmore*, 12th Dist. Warren No. CA99–12–137, 2000 Ohio App. LEXIS 3535, *16, 2000 WL 1086722 (Aug. 7, 2000).

{¶ 37} The Seventh District has commented on the similarity between a police interview room and the back of a police car, stating, "there is really nothing to distinguish a police interrogation room from conversations in the back of a police car." *Clemons, supra*, at ¶ 75. We disagree. Police cars are typically equipped with visible cameras or other recording devices. Therefore, an expectation of privacy in the back of a police car is not reasonable as a matter of course.

{¶ 38} The problem in this case is that the interrogation room contained no indicia that the activity could be monitored or recorded. Except for the table and chairs, it was an empty room, with no windows or other means of viewing into the room. The only other discernible object in the room was a thermostat. It is not reasonable to suggest that most

people would expect a thermostat to be a video and audio recording and monitoring device. If the police truly believe that no reasonable person would have an expectation of privacy in such a room, the recording equipment should not need to be disguised.

{¶ 39} The reasons given for hiding a recording device in a thermostat are unconvincing. It is disingenuous to assert that the reason for the recording device is to protect against escape, suicide attempts, or the passing of contraband between persons. These goals are readily accomplished with visible equipment. Indeed, if the purpose is to discourage nefarious conduct within interview rooms, a visible camera would be more valuable because its presence would deter such conduct. Hidden recording devices are quite obviously intended to secretively gather evidence for use in criminal prosecutions.

{¶ 40} The interview room used in this case is actually designed and arranged to suggest activity in the room is not being recorded. As a result, a reasonable person, regardless of his status, would have an expectation that he is not being monitored. Thus, the statements should have been suppressed.

{¶ 41} However, that does not end the inquiry. If Williams was not prejudiced by the admission of the statement, the error is harmless. Constitutional errors in the admission of evidence are non-prejudicial when harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Constitutional error in the admission of evidence is harmless beyond a reasonable doubt when "the remaining evidence, standing alone, constitutes overwhelming proof of the defendant's guilt." *State v. Williams*, 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph six of the syllabus. Admission of a statement in violation of the defendant's constitutional rights is harmless beyond a reasonable doubt when it is duplicative of other admissible testimony. *See State v. Jenkins*, 11th Dist. Lake No.2003–L–173, 2005–Ohio–3092, ¶ 38.

{¶ 42} Even if the trial court suppressed the statements Williams argues should have been excluded, the remaining evidence provided overwhelming proof of Williams' guilt. The conversation was limited to Williams' statements that he had been in the store on the date of the shooting but did not shoot Darwish, and his description of items that he usually purchases when he is in the store. Williams later told Detective Mackey that he did not shoot Darwish but indicated he was not sure whether he had been in the store on the day Darwish was shot. The item description was also later provided to Detective Mackey during the course of the formal interview and, therefore, was already properly before the jury. Furthermore, Williams argues in his brief that "it was uncontroverted that the Appellant was in the store on the morning of the incident" to support the argument that his DNA could have been on the bottle without warranting a finding that he was the perpetrator of the crime. Therefore, Williams' statement to his mother that he had been in the store that day was actually beneficial in light of the DNA evidence adduced at trial, as it established a justification for his DNA being present on the bottle found at the scene.

{¶ 43} Thus, although Williams' statements should have been suppressed, their admission was harmless beyond a reasonable doubt. Therefore, his first assignment of error is without merit.

*Williams*, 2013 WL6081535, at * 4-7.

In *Stone v. Powell*, the United States Supreme Court held, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 494 (1976). In order for the rule of *Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim and the presentation of that claim must not have been frustrated by failure of that mechanism. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982). "[T]he *Powell* 'opportunity for full and fair consideration' means an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013), *cert. denied*, 135 S.Ct. 1174 (2015). Instead, when considering whether a petitioner had a full and fair opportunity to litigate his Fourth Amendment claim, the court "asks a more basic and readily administrable question: Did the state courts permit the defendant to raise the claim or not?" *Id*. at 640.

Ohio has a mechanism in place for resolving Fourth Amendment claims; it provides a defendant the opportunity to file a pretrial motion to suppress and the opportunity to take a direct appeal from the denial of the motion to suppress. *See Riley*, 674 F.2d at 526 (finding that Ohio criminal and appellate rules provide adequate procedural mechanisms for litigation of Fourth Amendment claims). Williams availed himself of that mechanism; he filed a motion to suppress in the state trial court (Doc. 10-1, p. 9) and he appealed the trial court's denial of that motion to the state Court of Appeals (Doc. 10-1, p. 64). Indeed, he succeeded in convincing the Ohio Court of Appeals that the trial court erred in denying his motion. That the state Court of Appeals then applied harmless error review and ultimately rejected Williams' claim does not allow

Williams to sidestep the rule in *Powell*.  *See Gilmore v. Marks*, 799 F.2d 51, 55 (3d Cir. 1986)

("for purposes of the *Stone v. Powell* rule, a habeas petitioner's claim that a state appellate court

improperly found a Fourth Amendment violation to be harmless does not have a separate identity

and may not be raised in a habeas petition in federal court."); *Moore v. Cowan*, 560 F.2d 1298,

1302 (6th Cir. 1977) (*Powell* applies to bar Fourth Amendment claims from habeas review even

when the state court of appeals did not discuss the merits of the petitioner's claim on direct

review but instead applied harmless error: "We do not read *Stone v. Powell* as requiring the

reviewing court to do more than take cognizance of the constitutional claim and render a

decision in light thereof."); *Good*, 729 F.3d at 638-639 (discussing *Moore* and stating that,

consistent with *Moore*, "the *Powell* 'opportunity for full and fair consideration' means an

available avenue for the prisoner to present his claim to the state courts, not an inquiry into the

adequacy of the procedure actually used to resolve that particular claim.").

 Williams does not argue that the state court prevented him from litigating the issue raised

in Ground One.  He only argues that the police recording of his conversation with his mother at

the station violated his Fourth Amendment rights.[4]  Docs 1, pp. 6-7; 15, pp. 8-12.  The Ohio

Court of Appeals agreed.  It cannot be said that the state courts denied him the ability to raise his

claim.  *See Good*, 729 F.3d at 640.  Because Williams cannot demonstrate that he was denied the

opportunity to fully and fairly litigate his Fourth Amendment claim, federal habeas review of his

first ground for relief is barred by *Stone v. Powell*.  Accordingly, Ground One is not cognizable.

**B.  Ground Two is not cognizable**

 In Ground Two, Williams argues that his convictions are against the manifest weight of

the evidence.  Doc. 1, p. 9.  Federal habeas corpus relief is available only to correct federal

---

[4]  Moreover, Williams does not challenge the Ohio Court of Appeals' harmless error determination that the admission of this evidence did not prejudice him.  Thus, even if the Court were to entertain the substance of Williams' claim, Williams cannot show, and does not allege, that the Ohio Court of Appeals' finding was contrary to or involved an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d).

constitutional violations.  28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 US 1, 5 (2010).  A claim

that a conviction is against the manifest weight of the evidence rests solely on state law and is

not a cognizable claim in a federal habeas petition.  *See Ross v. Pineda*, 2011 WL 1337102, at *3

(S.D.Ohio April 11, 2011) ("Whether a conviction is against the manifest weight of the evidence

is purely a question of Ohio law," citing *State v. Thompkins*, 678 N.E.2d 541 (Ohio 1997)).

Because Williams' manifest weight of the evidence claim in Ground Two rests only on state law,

it is not cognizable on federal habeas review.  *See id*.

### C.  Ground Three fails on the merits

In Ground Three, Williams argues that the two offenses he was convicted of—aggravated

robbery and felonious assault—are allied offenses of similar import and should have been

merged pursuant to Ohio law.  Doc. 1, pp. 13-15.  He asserts that the failure to do so violated the

Double Jeopardy clause of the federal and Ohio constitutions.  Doc. 1, p. 13.

"The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution

states that 'no person . . . shall . . . be subject for the same offense to be twice put in jeopardy of

life or limb . . .'"  *Person v. Sheets*, 527 Fed. App'x 419, 423 (6th Cir. 2013) (citing *Benton v.

Maryland*, 395 U.S. 784 (1969)).  "[A] defendant may not be subject to multiple punishments

unless the state legislature intended to so punish."  *Id*. (citing *Missouri v. Hunter*, 459 U.S. 359

(1983)).  "The Double Jeopardy Clause 'protects against a second prosecution for the same

offense after acquittal. It protects against a second prosecution for the same offense after

conviction. And it protects against multiple punishments for the same offense.'"  *Duncan v.

Sheldon*, 2014 WL 185882, * 31 (N.D. Ohio Jan. 15, 2014) (quoting *Volpe v. Trim*, 708 F.3d

688, 696 (6th Cir. 2013) (internal citations omitted)).

> In *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the
> Supreme Court developed the "same elements" test to determine whether Congress has
> authorized cumulative punishments: "The applicable rule is that, where the same act or

transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id*. at 304, 52 S.Ct. 180. The *Blockburger* test, however, is a "rule of statutory construction," *Albernaz*, 450 U.S. at 340, 101 S.Ct. 1137 (quoting *Whalen v. United States*, 445 U.S. 684, 691, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)), "not a constitutional test in and of itself," *McCloud v. Deppisch*, 409 F.3d 869, 875 (7th Cir.2005), as quoted in *Palmer v. Haviland*, 273 Fed.Appx. 480, 486 (6th Cir.2008) (unpublished); *see Hunter*, 459 U.S. at 368, 103 S.Ct. 673 (explaining that the *Blockburger* test, as modified by subsequent precedent, "is not a constitutional rule requiring courts to negate clearly expressed legislative intent"). As a result, the *Blockburger* test "does not necessarily control the inquiry into the intent of a state legislature. Even if the crimes are the same under *Blockburger*, if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." *Johnson*, 467 U.S. at 499 n. 8, 104 S.Ct. 2536; *accord Hunter*, 459 U.S. at 368–69, 103 S.Ct. 673.

*Volpe*, 708 F.3d at 696-697.  "[W]hen assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes." *Id*. (quoting *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989)).  "Thus, for purposes of double jeopardy analysis, once a state court has determined that the state legislature intended cumulative punishments, a federal court must defer to that determination." *Id*. (citing *Banner*, 886 F.2d at 780).  In Ohio, to determine whether the legislature intended to authorize cumulative punishments, courts apply R. C. § 2941.25[5] (Ohio's multiple counts statute), not the *Blockburger* test.  *See Volpe*, 708 F.3d at 697; *see also Jackson v. Smith*, 745 F.3d 206, 212 (6th Cir. 2014) ("Ohio courts apply . . . [R.C. § 2941.25] not the *Blockburger* test, to ascertain the Ohio legislature's intent.") *cert denied*, 135 S.Ct. 118 (2014).

---

[5] R.C. § 2941.25, Multiple Counts, provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

Here, the Ohio Court of Appeals analyzed Williams' multiple-count conviction and

sentence under R.C § 2941.25 and applied the standard enunciated in *Johnson*:

{¶ 50} In his third assignment of error, Williams argues that the trial court erred in sentencing him for both aggravated robbery and felonious assault, along with the related gun specifications, as they were committed with the same animus and should have merged.

{¶ 51} The Ohio Supreme Court has clarified that in reviewing a trial court's R.C. 2941.25 merger determination, we apply a de novo standard of review. *State v. Williams*, 134 Ohio St.3d 482, 983 N.E.2d 1245, 2012–Ohio–5699, ¶ 28. However, we note that the trial court conducted an extended analysis based on the facts adduced at trial.

{¶ 52} "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution" prohibiting multiple punishments for the same offense. *State v. Underwood*, 124 Ohio St.3d 365, 922 N.E.2d 923, 2010–Ohio–1, ¶ 23. It provides that "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." R.C. 2941.25(A). However, "[w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each," separate convictions and punishments are proper. R.C. 2941.25(B).

{¶ 53} To determine whether two offenses are allied offenses of similar import subject to merger, we consider the conduct of the accused. *State v. Johnson*, 128 Ohio St.3d 153, 942 N.E.2d 1061, 2010–Ohio–6314, syllabus. The Ohio Supreme Court has described the application of R.C. 2941.25 to specific conduct as follows:

In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' *Brown*, 119 Ohio St.3d 447, 895 N.E.2d 149, 2008–Ohio–4569, ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

17

> Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.

*Johnson* at ¶ 48–51, 942 N.E.2d 1061.

{¶ 54} Because it is possible to commit felonious assault and aggravated robbery by the same conduct, the issue here turns on whether the two crimes were committed with the same act and a single state of mind. If they were, merger would be appropriate. However, the trial court did not err when it failed to merge the two offenses and correctly sentenced appellant separately for felonious assault and aggravated robbery. R.C. 2941.25(B).

{¶ 55} The testimony of Darwish established that Williams asked for a cigar, Darwish turned to retrieve the cigar, and upon turning back around, was immediately shot by Williams. Following the shot, Williams then asked Darwish to give him the money. Darwish handed him money from the register, and Williams demanded more money, which Darwish gave him. The shooting occurred before the request for money, and there was no evidence that Darwish failed to comply with any orders made by Williams.

{¶ 56} The testimony showed that the shooting was not necessary to carry out the robbery. There is no evidence to support a conclusion that Williams needed to fire the shot to gain compliance. Instead, he could have used the weapon as a threat to complete the robbery.

{¶ 57} As the trial court noted:

> [T]here was not a single act with a single state of mind demonstrated by the actions of the defendant. The Defendant shot the storekeeper before he demanded the money while he was threatening the storekeeper with a firearm. The storekeeper gave the defendant no reason to shoot him and was cooperating at all times. The aggravated robbery could have been easily accomplished by means of the threat with a deadly weapon. Not only was the shooting of the storekeeper unnecessary to accomplish the robbery, it demonstrated malice separate from the theft with a deadly weapon, to harm with a deadly weapon. The bottom line is that there were two (2) acts committed with two different states of mind * * *.

{¶ 58} Shooting the victim resulted in serious and significant harm. Threatening the victim would not have had nearly the same impact. Accepting the position posed by appellant would result in no separate consequence for shooting the victim, as opposed to just threatening and robbing him.

{¶ 59} Several districts have held that using greater force than necessary to complete an aggravated robbery also indicates a separate animus. *See State v. Shields*, 1st Dist. Hamilton No. C–100362, 2011–Ohio–1912, ¶ 19 (by physically attacking the victim, the defendant "subjected the [victim] to a substantially graver harm than if he had merely displayed, brandished, indicated his possession of, or threatened to use" the weapon in

the robbery, which constituted a separate crime); *State v. Ruby*, 6th Dist. Sandusky No. S–10–028, 2011–Ohio–4864, ¶ 61 (a separate animus existed as to the assault, since it was unnecessary to commit the theft offense and to establish physical control over the victims); *State v. Diggle*, 3rd Dist. Auglaize No. 2–11–19, 2012–Ohio1583, ¶ 18 ("a defendant's excessive use of force is an indication of a separate animus"). Similarly, if one offense is complete before the other begins, the offenses are considered separately for sentencing. *See State v. Dewitt*, 2d Dist. Montgomery No. 24437, 2012–Ohio–635, ¶ 33.

{¶ 60} The shooting constituted a greater use of force than necessary to accomplish the robbery. As the assault did not further or aid in the commission of the robbery, it was a separate act with a separate animus. *See Shields*, *supra*, at ¶ 19 ("this assault was so unnecessary for the robbery itself that it demonstrated a significance independent of that robbery"). Furthermore, the felonious assault was completed the moment the gun was fired. As this occurred before any demand for money, the felonious assault was complete before the robbery began.

{¶ 61} Williams cites *State v. Darnell*, 5th Dist. Delaware No. 10 CAA 10 0083, 2011–Ohio–3647, in support of his claim that the two offenses were committed with the same animus. In *Darnell*, the court held that the defendant caused "harm to the victim with the butcher knife while demanding money" and that the assault and robbery were committed with a single animus. That case is distinguishable, insomuch as the victim could not recall exactly when the assault occurred, and the court noted the assault took place "while [the defendant was] demanding money." In the present matter, it is clear that the shooting occurred prior to the act of robbery.

{¶ 62} The third assignment of error is without merit.

*Williams*, 2013 WL6081535, at *8-10.

Williams does not challenge the law applied by the state court.  Instead, he argues that the state court erred when it determined that he committed felonious assault and aggravated robbery with a separate animus.  Doc. 15, p. 13.  He contends,

> there is simply nothing in the record that indicated that the shooting of the victim was anything but part and parcel of the robbery.  Nothing in the record indicates any sort of prior problem between the perpetrator and the victim, nothing occurred between the perpetrator and the victim prior to the demand for money, and the record is quite clear that the shooting was part of the perpetrator[']s efforts to obtain the money.

Doc. 15, p. 13.  Thus, Williams challenges the state court's decision as unreasonably applying the correct legal principle to the facts of his case.  *See* 28 U.S.C.A 2254(d)(2).

Williams' challenge lacks merit.  The record clearly indicates that more than "nothing"

occurred between Williams and the victim prior to the demand for money: Williams shot the

victim before he demanded money.  The only person who testified about the shooting and

robbery was the victim (Doc. 10-3, pp. 60-63, 93) and no one else witnessed the crime.  Thus,

the Ohio Court of Appeals' subsequent determination that the assault was completed when the

gun was fired and was unnecessary for the robbery, i.e., that Williams had a separate animus for

each crime, is not an unreasonable determination of the facts in light of the evidence presented in

the state court proceedings. *See* 28 U.S.C. 2254(d)(2); *Wood v. Allen*, 558 U.S. 290, 301-302

(2010) (evidence presented in the state court record "can fairly be read to support the [] court's

factual determination" and the finding was not, therefore, unreasonable).  Accordingly, Ground

Three fails on the merits.

## IV. Conclusion and Recommendation

For the reasons stated above, the undersigned recommends that Petitioner's habeas

Petition be **DISMISSED** in part and **DENIED** in part because Grounds One and Two are not

cognizable and Ground Three fails on the merits.


Dated: December 22, 2015

_____
Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir.
1981); s*ee also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).